Sandoz Inc. v. Sandoz Inc. v. Sandoz Inc. Mr. Groombridge. Thank you, Your Honor. We will do our best to proceed with no raised voices, even though we have a very exciting question of statutory interpretation here. Now, I'd like to begin with the first of the two principal issues, which is whether the statute, and the very first place in the statute, in the BPCIA, where that issue is addressed. So it isn't just the provision of the information, it's also the notice provisions, is it not? And whether those are mandatory, are you going to separate those? Yes. There is the notice provision with respect to the so-called Notice of Commercial Marketing under what I'll call Section 8A, or subpart 8A of Section 262. And my intention, Your Honor, if this is acceptable, is I'll come to that and first deal with the question of whether the BLA and associated manufacturing information must be provided, or whether it is optional at the discretion of the biosimilar applicant. Well, what you're going to tell us, Mr. Groombridge, is that shall means shall. In fact, it means must. And usually that is true. But this is a statute that's a multifaceted statute. I'm thinking perhaps it's entitled to a pure surprise for complexity, or unclarity, or something. But there is an L9 provision, a default provision that says if shall isn't complied with, then there are remedies. And why don't we consider all of this as a totality, as we must, and rely on the L9 remedy? I think we absolutely should consider the statute as a totality, Your Honor. But L9 is not a remedy. L9 taken as a whole is merely a prohibition on declaratory judgment actions under certain circumstances. And the reason L9 exists is to be a gun-jumping prevention. In other words, L9A is the principal reason for it to exist to say that with respect to certain categories of patents, you cannot short-circuit the procedure that is put in place by virtue of filing a declaratory judgment action. So tell me why shall means may. In our view, Your Honor, shall does not mean may. Shall means shall. And the first place in the statute where that appears is section 261L1B1. And what that section does very importantly is draw a direct connection, linkage, between the decision to use the biosimilar pathway, the K pathway, and the requirement to provide the BLA and the manufacturing information. And what it says is when a subsection K applicant submits an application under subsection K, such applicants shall provide access to the information required to be produced. But isn't there a provision that says one shall file a patent infringement action? Yeah. And that can't mean that. I mean, one doesn't have to do that. In our view, Your Honor, it does mean that. And there's very good reason for that, that part of the purpose of this regime, elaborate as it is, is to allow a biosimilar applicant the ability to flush out patents that are identified in the early part, the first phase, of the exchange process, should it wish to do that. And there's a very good reason for that, because if the applicant, under many circumstances under which a biosimilar applicant, like a traditional generic drug applicant, may face ruinous damages exposure if it launches at risk. And therefore, the statutory regime gives the applicant the ability to precipitate litigation early on before it has incurred such liability. Right. So what if I agree with you that L2 through L6 really illustrate that Congress intended for the parties, the K applicant and the RPS, to come together to try to negotiate out a reasoned way of following through on patent litigation. But then when we get to L9C, the last part of subsection L, we see that Congress says that if the K applicant failed to follow through on L2, then the consequence of failing to You, the patent owner, can now file a patent infringement suit, and that's further reinforced by 271 E2CII. Or E2C2, as we would refer to it. E2C2. I'm happy to address both of those, Your Honor. E2CII. And maybe it's best to start with E2C2, where what is going on, I think, and those are the two places in the statute that refer to what happens if the K applicant does not provide this information. So I think it would be logical to begin with section 271 E2C. And one of the things that's important to note here is that the two provisions that talk about what happens if the information is not provided are both ancillary provisions that follow a base case, if you will, where the information is provided. And we would suggest, Your Honor, that part of the reason for the two ancillary provisions is so that the K applicant cannot put itself in a better position by virtue of withholding the information than the position in which it would have been had it given the information. And if we look at E2C as a whole, E2C is structured so as to borrow from the Hatch-Waxman regime and to say that we are going to create an artificial act of infringement that has been comparable to the one that has been the subject of very much jurisprudence before this Court. And for good and proper reasons, I suggest that Congress wanted to use the same artificial act of infringement, which is the submission of a regulatory application to the Food and Drug Administration. Now, that is going to occur some period of time, typically around 80 days, before the decision or face the requirement to turn over the corpus of information to the reference product sponsor. And therefore, we have to know, we have a temporal problem that the act of infringement occurs before we've reached that fork in the road where the information either is or isn't provided. And what we would suggest, Your Honor, is that the reason for the structure of E2C is to say the act of infringement is the submission of the regulatory application. The submission or the notice? No, the submission, Your Honor. The technical act of infringement here, in our view, just as with Hatch-Waxman, is submitting to the Food and Drug Administration the application for an abbreviated approval. But E2C2 seems to be saying something very much different than the Hatch-Waxman Act. Hatch-Waxman Act, an act of filing the application. Okay. But here, E2C2, it's when the applicant, the K applicant, fails to follow through on its L2 obligation to turn over a copy of the biosimilar application and then any manufacturing information. It's at that stage where it seems like just the plain language that that is the artificial act of infringement. No, I disagree, Your Honor. Although, to Judge Laura's point, this certainly is not the most plainly worded statute. The act of infringement, it is carefully structured so that it is the submission. And if Your Honor were to look in the middle of the body of text of both E2C1 and E2C2, we will see after a comma the words, an application. And so the structure of the statute is it shall be an act of infringement to submit A, B, C, and then in C1, an application, and in C2, an application. The only difference is that in C1, it's going to be an act of infringement of a body of patents that will be defined after the exchange process has gone forward. Whereas in C2, that exchange won't happen because the applicant withholds the information and, therefore, we need to know which patents this will constitute a technical act of infringement of. And, therefore, it is any patent which could have been identified had the exchange process proceeded. Is the technical act of infringement in Hatch-Waxman the paragraph for certification? No, Your Honor. I would suggest that under 271E2A, which is the relevant provision, it's the submission of the, in that case, ANDA, to the Food and Drug Administration. And that the BPCA has been purposefully structured so that these provisions slot in to 271E2 to have the benefit of the same body of law. Let me understand your theory of infringement. It's the act of filing the K application is the act of infringement. Correct. But you won't really know which patent until a few months down the road after the patent owner submits the patents pursuant to L3? That is correct, Your Honor. And this is why we have this temporal issue. And so the act of infringement occurs before we know which patents are going to be infringed. And that is why... Is there any statute that that's the way it works? I mean, I've never seen something like that. I think this statute, I think, was purposefully written that way. And I would suggest, Your Honor, that it was done because to deal with the complexities of the patent, of patenting around biologics, that the fundamental difference between this regime and Hatch-Waxman, Hatch-Waxman relies on a registry, the orange book, that is established once and for all for everybody. This procedure invokes a kind of what I would call a bespoke identification process that says we are going to identify the body of relevant patents. Mr. Gormley, time's moving on. I want to ask you about notice. Certainly. Your view is that notice cannot occur until after approval of the product? Correct, Your Honor. And it doesn't add another six months to exclusivity in contradistinction to the 12-year provision? We would say no, Your Honor, because exclusivity is a term of art in this field. Exclusivity means a time in which no other application can be approved, and that is not true here. And that under the doctrine of, let's say, I believe Justice Frank vertical, the transplantation, that when Congress takes a term that already has a meaning from one body of law and puts it into a new law, it is assumed that it brings with it, to follow the metaphor, the soil that surrounds it. Didn't they give you notice last July? I'm sorry? Didn't they give you notice last July that said when we're approved, we will market? They did. They got approval in March. And so, I'm sure, outside of the fact that we've granted an injunction, can't they go on the market in September? No, Your Honor, we, well, one of the things to note is that in hedging their bets, they also gave us notice after they were approved. Right. So, they have done the thing that we believe they should do, and in our view, that would start the six-month clock running. But in our view, the only reasonable reading of the statute is that the notice must be given after the product is approved by FDA. And the reasons, there are several reasons for that, which I'm happy to address. First is the choice of language in L8A itself, where in contradistinction to the rest of the product, which is the subject of the K application. Well, sir, to try and simplify the argument, then, you think that your position is that there must be notice at both stages? Correct, Your Honor. And that shall is mandatory? Correct, Your Honor. And that, and this is really where the district court took the position is that you're arguing with, as I understand it, that the district court says, all right, but if they don't give you the information. You didn't say, if they don't give you the notice. You said, if they don't give you the information, then you can sue them. The district court said that, and the district court also said that, following the logic that, well, the statute prescribes in L9 some consequence that flows, then all of this is not provide the notice. And the first thing that we, as the reference product sponsor, might learn is the day that they launch the product. And that cannot be right. But if we agree with you that shall means shall, what happens next? They have to go back to the beginning of the exchange process? In this case, Your Honor, what we want is to be put in the position that we should have been in, had the statute been followed.  interpretation of the statute is to reverse the judgments against us on our claims and Senator's counterclaims below, and then clarify what the statute means, and then send the case back to the district court for it to fashion a remedy that will put us in the position where we would have been. We're not asking for a windfall here, but we are asking, ultimately, what Amgen wants. You're not asking for a windfall, but you've had exclusivity for over 20 years. Well, I respectfully disagree with that. For those 20 years, anyone that wanted to... And you still have a use patent, that's right? We have a use patent that covers one of the indications, one of several indications, and we have, we believe, two method of making patents that are relevant here that we expect to enforce in further proceedings below. But one of the things they do want to point out on the notice provision, that there's only one place in the statute that talks about commercial marketing and approval together, and that is section K6, which deals with exclusivity for the first biosimilar applicant. This would be a cognate, if you will, of 180 day exclusivity that generics can get under exclusivity for the biosimilar is the shorter of one year from first commercial marketing or 18 months from approval. Just a gap in my understanding. This is marketing exclusivity, not exclusivity of access to the Amgen data? The exclusivity in K6 is exclusivity for the biosimilar applicant as against subsequent biosimilar applicants. What kind of exclusivity? Exclusivity of marketing, exclusivity of approval by the FDA? Correct. Or exclusivity of access to the data? Exclusivity of approval by the FDA. In other words, K6 says that when certain requirements are met, the FDA shall not approve another... Your access to the data through the FDA is inherent in the statute. That's not in question. Our access is the reference product sponsor, I think. Yeah, right. Their access to the data. Sorry. Well, I think their access... Our view, Your Honor, is this, that their access to the data is inherent in the statute as long as they comply with the statute. Our fundamental problem is that what Sandoz has done in our view is to come in and say, we'd like to follow the pieces of the BPCAA that we think benefit us, but we'd like to not follow the pieces that we don't like. In our view, Your Honor, you can't do that. This is what the 262L1B1 says. You can either follow the whole process or you can choose to go under the A pathway and file your own application, don't invoke the K pathway at all, and you can get on the market. Others have done that, Your Honor. For example, Teva has done that. There's already another competitor in this space. So to say that we enjoy 24 years of exclusivity isn't correct, that people are free to come on the market. I know you've ran a lot more than 12. Well, that's certainly true, Your Honor, but I see that I'm woefully over my time. I'm sorry, I've got another question. Yes. I don't see anything in subsection L that links up all of these requirements to all these information exchanges with the approval process. The approval process, I view that as all about subsection K, and then subsection K provides all the requirements the applicant must meet in order to get approval for its biosimilar, and L is really just about regulating patent litigation. I feel like ultimately part of your case rests on reading subsection L as being hooked into if the requirements aren't met, then therefore there can't be approval. I don't think we would say there can't be approvals. We certainly do say that they are joined together, and where they're joined together is 262 L1B1, which says when a subsection K applicant submits a subsection K application, it shall provide the information required under L2, which in turn triggers the cascade of events that run through L2, subsection L, and therefore we would say there's not a prohibition here. Again, unlike Hatch-Waxman, we're not looking at a situation where the statute specifically says FDA, you're not allowed to approve this, but the beginning point is joined directly together, to yoke together by 262 L1B1, and what that is saying is if you want to invoke the benefits of the K pathway and enjoy abbreviated approval and the market position that comes with being a biosimilar, then you must provide the information and begin the cascade of events that runs through subsection L, and if you don't want to, you don't have to, but that's your choice to make, and that's where the point of connection is, Your Honour, and what I would just like to also point out with respect to the notice is that if we do look at K6, which is the only place where notice of commercial marketing and approval are used together approximately, the statute says those two things, one would occur at 12 months and one at 18 months. You can't read that without thinking that first commercial marketing and approval are not intended to be at the same time. That's clearly the intention of this, and that informs what's going on in L8A. If we look at L8B, the purpose of L8B, the notice is to allow an orderly time, six months, in which a second phase of litigation can be conducted to benefit both parties and the courts, and that if we look at the effect of the district court's interpretation and the interpretation urged by Sandoz on L8B, the idea that you can give notice immediately has the effect that you can then reduce the 180-day period for preliminary injunctions to zero, because the body of patents that are the subject of L8B are a body of patents that take more than 180 days to identify. So if I can just give you notice, as Sandoz did here, I can just say, good news, I filed a biosimilar application and it is my intention to mark it as soon as I can. What I've effectively done is reduce the time period that the statute contemplates under L8B to zero, and that can't be the right interpretation. One final point on that, I would also have the effect under L9A of reducing the standstill on declaratory judgments to zero, because that standstill ends when the notice is given. So we'll look at this and say there is no way that you can read this admittedly complicated statutory regime to make sense if you accept the premise that the district court adopted and that Sandoz advocates that notice can be given on day one. And when you think about it, why would an applicant submit a K application unless at some point it intended to market this? What is the purpose of 8A? What does it bring to the party? It can't merely be that the applicant has decided to go to the trouble of filing a K application. It must be something more than that. And the only way it makes sense is if the something more is an additional period of six months in which to have an orderly litigation of whatever patents didn't get swept up in the first wave of litigation. All right, let's hear from the other side. We'll save you some rebuttal time, Mr. Groombridge. Ms. Maynard. May it please the court, Deanne Maynard for Sandoz. The district court correctly concluded that Sandoz did nothing unlawful under the BPCIA. That alone defeats Amgen's appeal. The BPCI procedures on which Amgen relies create multiple ways to the same substantive end. They're awfully detailed. They're awfully detailed concerning the exchange of information. Why would that have been for Nott if he could just skip it? They're awfully detailed. But it's not just the L2 to L6, which they like to focus on. The BPCIA statute is very comprehensive. It creates artificial acts of infringement. And I like to discuss the policy you had, Judge Chin, with opposing counsel. They create very detailed scheme. And you have to look at both the artificial acts of infringement and all of L. As you pointed out, Judge Lurie, L9 is also part of L. And it expressly contemplates a series of if-then. If this happens, then this can happen. If this happens, then this can happen. It's Sandoz that's operating completely within the confines of the BPCIA. It's Amgen that's trying to look outside the BPCIA and ask the court to impose state remedies found nowhere in the BPCIA. And in fact, when Congress wanted to allow for injunctions, it provided for them. What is your explanation of why the statute says shall instead of may? It says shall instead of may for two reasons, Judge Newman. It says shall in the sense of in the L2 clause and the patent exchange provisions from L2 to L6 in the sense of if you want to go through this process, this is the information you must provide. If you want my data, if you want to be a K applicant, which I gather Sandoz has done, that has used the data, hasn't gone through their own clinical trials or all the rest of it, then this is what you shall do. You don't have to use the Amgen data. You can create your own. Then you're home free. No, Your Honor. That's not the question here. So, yes, there is a choice between going under A and going under K. But why isn't it the question if you have a statute? This is an integrated statute. From the record, it looks as if there were extensive hearings, tradeoffs, or debate or connection of the pros and cons of Hatch-Waxman for biosimilars. And here we have a complicated statute. And you say only some of it counts? No, Your Honor. In fact, it's Sandoz that's giving meaning to all of it. And it's Amgen that's trying to look outside it for remedy. The way that the shall provision works is it starts with L2. If the K applicant wants to engage in the patent exchange process, in the back and forth of the L2 to L6 provisions, then it shall provide certain information. It also may provide additional information, but it doesn't have to want to continue. But then in L9C, the statute provides if the applicant doesn't provide the application, then the sponsor may immediately bring a patent to Unlimited, buy the patent. It can choose. But even that subsection does not excuse the giving of notice. It relates only to providing information. Isn't that right? Well, are you asking about L8, Your Honor, or are you asking about the notice in L8? The L9 also provides for the failure to comply with L8, although Sandoz complied here, so that question is not before the court. But L9B provides that expressly, that if the applicant fails to comply with the notice provision in L8A, that the recourse for the sponsor is to bring an immediate patent suit for declaratory infringement. And you can't really look at the L8. How can you file suit if no one tells you, I'm getting ready to infringe your patent? If someone were to completely go under the radar and launch without anyone knowing, without there ever being any public notice, then the sponsor's remedy would be to bring a patent infringement suit. But that problem, Your Honor, that problem obtains under either party's view of the notice provision. It's hard to make sense of the extensive legislative debate about those provisions based on the way you're interpreting it. So help us. Yes, Your Honor. So on the legislative debate, all of the legislative discussion is about previous Congresses. There's very little actual history about this Act that was passed. So on its terms, though, I think it's very important to focus on the acts of infringement in 271E. Before you get there, you seem to be reading L2 through L6 as an option. And then if the applicant doesn't choose that option, then there's the L9 option. And I just don't see, either through the language or the structure of L, where there's a hint that it's a choose-your-own-adventure situation for the K applicant. It seems much more like the L2 through L6 keep saying over and over and over again, shall do this, shall do that. Then L9 finally gets to, well, if the K applicant fails to provide the application in a timely way, then the patent owner can bring a D.J. action at that point. So in that sense, it does feel like it's mandatory. And then if you fail to meet your requirements that are your obligations under the statute, then you deal with the consequences in L9C. Now, you might end up in the same situation in that when it says shall L2 through L6, there isn't some kind of absolute requirement that you have to do that. But it's a question of if you fail to meet your requirement, then L9C applies. I think when you look at the whole statute, the whole BBCIA in context, including the D.J., the Amendments to the Declaratory Judgment Act, as well as the artificial infringement provisions, as well as all of L, that's not the conclusion one comes to. And the district correctly concluded that. And to your fail point, Judge Chen, so the statute expressly in L, and this is on page 360 of the Blue Brief Detachment, in L4B, there's a subheading called failure to reach agreement. So the statute uses the word fail when it's not talking about a mandatory obligation that one has not done. It's just something that happens when one doesn't do one thing, then something else happens. When there's a failure to reach agreement in 4, that pushes you to L5. On the shall provisions, when one looks at L2, if one wants to proceed to the next step, and sometimes it's the sponsor and sometimes it's the applicant, you shall do this. It would be a very— But L2 doesn't say the word if. But L9 does. And you have to look at the whole thing in context because L9, when you look at it in context, you see that the entire section of L is a series of if-then kind of shalls. If you want to do this, then you shall do that. If you don't do this, then this is with a consequence. I mean it's important to keep in mind here. The only substantive rights at issue in this whole scheme are patents. That's the title of L, patents. And it's just a procedure in many different processes and all kinds of situations are covered to put the parties into the artificial infringement suit in 271E2. That's the whole point of this. It's just process. There's no substantive rights created in this section at all for anyone. What if L9 didn't exist? What if it was just stopped at L8? Well, if there was no L9, it would be a very different question and a harder issue for us. But L9 does exist, and they're reading it as if it's not there. And L9, if you think of L9 as all the if-thens, and L9B captures a lot of if-thens. It captures a lot of if-thens from various provisions up in the L. So you could also have written the statute where you moved all the if-thens up to where they go, and it would have been more repetitive and perhaps more complicated. But it would have led to the same outcome, which is if Amgen has any patent rights, they should litigate them. That's what Congressmen have to do. I want to ask you about the notice provision. Yes, please. How can one reasonably interpret that as meaning give notice 180 days before a date which was then undetermined? Doesn't that really mean after approval date because then you know what the date is? No, Your Honor. There's nothing in the language of it that talks about after anything. And when Congress wanted to say after licensing, it did so. So there are provisions in the statute that expressly talk about things happening after the first licensure of the bond, for example. But the language says after. You need to tell us why that doesn't count. No, Your Honor. The language doesn't say that. When it approved. It has the word approved. I don't know the right word. No, Your Honor. If we can look at it together, it's on page 362 at the top right-hand corner numbering of the Public Health and Welfare Statute in the back of the blue brief. It's actually on 361 on the right-hand column at the top. It's L8. It's called Notice of Commercial Marketing. Importantly, it's called Notice of Commercial Marketing. It doesn't have anything about any kind of stay, any kind of 180-day stay, and preliminary injunction. A Notice of Commercial Marketing. The subsection K applicant shall provide notice to the reference product sponsor not later than 180 days before the date of commercial marketing. It's the before modifies the first commercial marketing.  Of the biological product license of subsection K. Then your notice was effective in March when the approval occurred, and then you shouldn't be able to market for 180 days, which is in September. Well, that's their reading, Your Honor. Under our reading, our July 2014 notice was fully effective, and it wasn't in any sense too early on the fact of this case. Sandoz correctly predicted that they were going to obtain it. At that point in time, it's entirely speculative. You had just filed the application. We have no idea. Anybody has any idea when or if that application is going to get approved. So it sounds a little nonsensical to say that that is an appropriate form of notice of commercial marketing when we don't have any clue on whether your application will ever get approved. Well, two points about that, Your Honor. The application was filed. The application is what... At that point, it's aspirational. When all of the other litigation, I mean all of L, even under their view, the way that L2 to L6 works, the litigation on those patents all occurs based only on the filing of the application, which is also how Hatch-Waxman works. All you have at that time is the application. That's plenty of information, especially once you get into discovery and you get the other information to know. Sandoz gave notice of what it believed, which is that it was going to get approval in the first or second quarter of 2015, and then, in fact, it did. And notice, I disagree with... We're right at the very beginning of the FDA reviewing and approving or denying these types of applications. I don't think anybody in July of last year had a good sense of when the FDA was actually going to act and then approve your application. I believe there are actually estimates of when the FDA is expected to approve products under the timeline that they put out. The timeline, I can't remember if that's in the record or not. But when they accept your application, there's no implication there that at some point it will be approved, is there? And certainly not when. Well, Sandoz expected that it was going to get approval, and then it did indeed get approval. I mean, Sandoz had a lot of experience with this product. They were going back and forth with the FDA. Did that occur at the time of acceptance, such that FDA says, yeah, well, you just need to add a few more items and we'll approve it maybe next spring? I don't know, Your Honor, what's in the record on that issue. But the important point is that the statutory language is what this court is interpreting, and it only says 180 days before commercial marketing. And Sandoz gave notice in July of 2014, it is not marketed since then, it's been six months, even if this court thought that that was not sufficient. Sandoz regave notice on the day of approval, and as Judge Gloria mentioned, six months from that would be September 2nd. That would be the outside date that any injunction against marketing could apply under their theories, even if the court... Isn't it true that when an application is filed, the application can be amended? It can migrate? The actual elements of the biologic can change, or the mechanism that you're submitting can change? It's not like you have a fixed product right there that is static, and for the rest of the pendency of the application, it's going to always remain the exact same thing. All of the BPCIA procedures envision, even under Amgen's theory, the L2 through L6 provisions, envision early litigation based on the filing of the application, which this court is quite familiar with in Hatch-Waxman. That's the basis on which those claims are tried. And if you just imagine a situation where... The statute actually takes account of a lot of different situations. If you imagine a situation where, what if Sandoz had provided its application and started down the patent exchange process and then obtained approval in the middle of the patent exchange process, there is nothing about that process that would have entitled Amgen to an injunction against marketing at that point in time. They would have had to go to court and show that there was some chance that they could prove patent infringement. They don't want to litigate their patents here. They've told the world they have no material patents left on this product and that they expect competition in the United States. What about the method of use patent, 427? Well, they've alleged that, Your Honor. That's count 3. That's still below in the district court. But that actually proves that this system works this way. That's what Congress said. If the application isn't provided to you, you may sue immediately. They've sued immediately. They've gotten the information that they claim they need in discovery. And if they have patents, they should litigate them. Those are the only substantive rights at issue in this whole statute. And as Judge Chin pointed out, nothing, nothing in K links approval to these provisions in L. It's very different, as counsel conceded, from the Hatch-Waxman in that regard. Approval is not tied to the outcome of litigation. And there's nothing about the exchange provisions themselves alone. So even if they were to force us to jump through these unnecessary hoops here when they could just get this information in the ongoing litigation, that wouldn't entitle them, the injunction to force us to jump through these procedural hoops for nothing. Even if they were to get that, that wouldn't get them a bar to commercial marketing. Let me ask you another question. Yes, please. Let's assume that you didn't comply with L2, but what that means is that L9C gets triggered, and so the patent owner has the right, also under E2C2, to file a patent infringement action, and it did that. And so all the provisions of L2 through L6 fall away, and necessarily L7. Would L8 also fall away with that? Because L8 arguably is part of the overall subsection L regime, and L8 references all of these other L2, L3, L5, and L7 refers to L8, L9 refers to L8. Maybe it's all integrated together, and so the whole question of whether there has to be 180 days notice or something like that just falls away once we're in the territory of L9C. That would be one reading. Another reading, though, I think is that… It's not a reading that you were promoting, though. …is that L8 is freestanding. Well, Sandoz gave notice here. Sandoz gave notice here under our theory, and Sandoz gave notice under their theory. So there's absolutely no question here about whether it is or isn't, but I think that if L8A is the freestanding notice provision, but in L8B, and I would like to explain how I think L8B works, the patents that are in L8B, what's covered by those provisions shifts over time depending on where parties are in the process. So here, of course, we didn't provide the application, so on day 21 they could have brought the suit. They could have gotten all the information. But in a situation where the parties are going through a suit, it doesn't always have to be this two phase that they're envisioning. That's what I'm saying. There are many different ways that the… In Congress's statute, if you go through it and imagine different hypotheticals in your head and you figure out how it goes, it's amazing how much of it is already taken care of. Is the preliminary injunction issue moot? This court, I think it is moot, Your Honor. They sought a preliminary injunction pending the merits decision, and the merits has been reached. To the extent the court doesn't think it's moot, the district court made factual findings here after consideration of substantial evidence that Amgen would have no irreparable harm, had not proven any irreparable harm from Sandoz's launching. That, in fact, would preclude any injunctive relief under any theory, state law, or anything else because it's always, even under the UCL of California, one has to prove the traditional eBay factors. Now this is initially an unfair competition. Premised on this federal statute. That's right, Your Honor. Any injunction, first, could only be limited to California. That's this court's holding in Athena. Two, no injunction is warranted even under the UCL because, as we've been discussing, no unlawful action occurred. Congress knew how to call the L sections of violation when it wanted to, and I'd like to point the court's attention to L1H where it talks about the breaches of the confidentiality provisions. And significantly, and unlike all the other provisions in L, Congress provided, called a violation of the confidentiality provisions. Let me point you to it. It's on page 359, Judge Lurie, in the back of the blue report. I see it. It's the bottom right. It's called effect of a violation. So Congress called a breach of the confidentiality provisions a violation of the VPCIA, unlike any of the other L provisions, and it expressly provided that that would be deemed irreparable harm and one could seek an injunction for that, unlike these other provisions where Congress provided no remedies to compel any steps. Instead, it said, if they aren't followed, you go immediately to the patent infringement suit. And Judge Tenna, I think 271E, 2C1 and 2 only create an act of infringement when either one of those are fully met. So E2CII, it's only an act of infringement once one fails to turn over the application. So on day 21, they could have, if they had wished, brought suit July 28th. As a practical matter, how would a patent owner even know about that act of infringement if there's no notice provided at all that the K applicant filed the K application? Well, here, Sandoz provided it. I'm just trying to understand how the statute works. Right. And I think, you know, the statute, that would be a problem under either party's interpretation of the exchange provision. Now, that's a really important question. How would they know? How could they do what's provided for in terms of filing a suit for infringement if they have no notice, not even a 20-day notice? Judge Newman, my point is, even under their interpretation, I'm just asking, what is the answer to that? If it really went under their ear, they might not know, but holding the statute means what they say won't fix that problem, because if someone's really going to withhold their application... You think it doesn't matter? Are you saying that it doesn't matter whether you know or not? I'm saying it's not... Does it matter whether you can comply or subject to that aspect of the statute? I'm saying if one really, truly doesn't know, that is a problem under either party's interpretation of the L provision. The statute says, shall, so that it doesn't happen that you don't know. Except if you don't do it, then the statute contemplates someone might not turn it over. So either way, whether the provisions are mandatory in all circumstances or only a mandatory condition precedent won't solve that problem. But there are many reasons why applicants have every incentive, as we did here, even when we didn't want to engage in the process, give notice. Because as you know from the bond briefing, it's very expensive to market these products, and it would cost a lot to go on the market and then be immediately enjoined. I think a district court would be very sympathetic, Judge Newman, to any patentee's claim of if someone did become a self-applicant and launch... Do you have any more questions? How come you didn't argue preemption? Well, because the UCL is self-preempting, Judge Chen. So the UCL expressly provides that unless expressly provided elsewhere. And here the remedies are exclusive. The E2C remedies expressly provide that these are the only remedies. These patent law remedies are the only remedies any court can award for the artificial acts of infringement in E2C1 and 2. So these are just procedures, and Connors was just trying to allow parties to do their substantive rights. If I could, we would request that the court, if it's inclined to rule for us, list the injunction immediately and require a posting of the bond for the period of time that the injunction was in place so that things can recover. Thank you. Okay. Mr. Greenbridge, you have some extra time. So I think the fundamental problem here is this. What this regime is designed to give a patent holder like Amgen is two things, information and time to analyze that information and enforce its patent rights in an orderly fashion. And the argument that if all... Failing which? Failing which, no information and no time. What we see then is exactly the kind of problem that has manifested itself in this case. Load on the judicial system with emergency applications, people coming in and saying they're about to launch, I only just found out about this, I need to protect my market. Failing which, we didn't finish the sentence, L9, right? Your Honor, L9, the way I would look at it, is neither a remedy nor an exclusive remedy. But it says that certain things don't happen then, therefore. I don't believe it ever says therefore. What it says is that the ban on declaratory judgment actions is lifted in certain circumstances. That is not a remedy for the non-provision of the information. Just as... L9C, it says if a subsection K applicant fails to provide the application and information required under paragraph 2A, L2, the reference product sponsor may bring an action under section 221 of title 28. It does, although noticeably only for a small subset of the patents that would otherwise be in play. I can't bring an action for a method of manufacturing patent under that section. It has to be a patent that claims the product. How about 271? There would be a technical act of infringement. The problem, Your Honor, is we wouldn't know. The whole purpose of this regime is to arm us. But wouldn't you find out if you brought a 271 action and did discovery? Ultimately, yes, but the whole purpose of the regime is to not have us running into court. And if you think, Your Honor, about what is contended here, the record establishes we have a portfolio of about 400 patents, many manufacturing patents that could be relevant. The argument is made on the other side, oh, no problem if we don't go through the exchange process. If the purpose of the statute is to avoid litigation, it's already failed. Certainly true, Your Honor, but I would suggest that... It doesn't show promise of success. If shall mean shall, I'm confident, Your Honor, that the litigation burden on the court system will be reduced. And that is part of why we are here. And one final point that I wanted to make, and I think it's important to not get lost here, is the statutory regime contemplates that the first phase of litigation could be many years before the second phase. You can file the K application four years in, but you can't get approval until 12 years in. So all of these procedures that are saying, oh, don't worry about, with respect to the notice provisions, what's really being said is we're going to file at four years and say we intend to mark it at year 12. And what you should do is go to a district court and ask for a preliminary injunction. You're probably an atypical case because you're right at the beginning. Right. Other innovators are probably going to be within the 12 years. And, of course, we have to interpret the statute not just for these parties, but in terms of what it really means. I wholeheartedly agree, Your Honor, and I think part of why we're here is that we see this not just for the present dispute about a product that has been on the market for many years, but as something that is integral to how this regime is going to work going forward. And ultimately, as a patent holder, what this is intended to get us, I would repeat, is information and time in which to analyse that information, exchange contentions, and come to court in an orderly fashion and not have to have a fire drill. And the argument that is being made, on the other side and without most respect, is, oh, what's the harm? Let's just go and jump to a lawsuit. And that guts the statutory regime. The one final point, Your Honor, with respect to whether this is moot, again, with greatest respect to my adversaries, I would say I think there's a miscitation of the record, and the citation that's given for that is A469. There's two requests that were made. It ignores the second request, which, if anyone is interested, appears at lines 25 through 27. What's the status of the patent infringement action? It stayed. And both parties agreed that it made sense to try and get the views of this court and then be able to go back to the district court and say, how do we move forward? And what's the patent involved? 427? 427. Two process patents. Exactly. There's a method of use patent, which is 427. Very shortly before the stay, we identified two method of manufacturing patents that we believe are implicated here. There could be others, but the stay came down at that point. Okay. Any more questions for Mr. Grover? Thank you. Thank you both again for taking over the submission. Thank you very much.